389 So.2d 498 (1980)
GEORGIA PACIFIC CORPORATION et al.
v.
Billy BLALOCK et al.
No. 52154.
Supreme Court of Mississippi.
October 1, 1980.
Rehearing Denied November 12, 1980.
*499 O.B. Triplett, Jr., Forest, John C. McLaurin, Jr., McLaurin & McLaurin, Brandon, W. Major Holifield, Laurel, for appellants.
Leon Mangum, Decatur, Thomas D. Lee, Forest, for appellees.
Before WALKER, BROOM and BOWLING, JJ.
BROOM, Justice, for the Court:
Adverse possession is the basis upon which the Chancery Court of Newton County decreed a land title to be vested in the appellees (complainants below): Billy Blalock, "Young" Bunyan Blalock, Zula Blalock, Lucy Leake, Lottie Hall and Ruby Furdge. Their bill to quiet title named as individual defendants (appellants here): Camellia Baskin, Mable Blalock and Otis Blalock; Georgia Pacific Corporation is the sole corporate defendant. In addition to decreeing title in favor of appellees, the lower court awarded them a $96,006 money decree for the value of the timber the individual defendants sold to Georgia Pacific which Georgia Pacific cut off the controversial land. We reverse.
Common source of title to the disputed 120 acre tract was Singleton Blalock, now deceased, who acquired record title in the early 1900's. Singleton was the grandfather of the individual litigants. For his failure to pay taxes (sometime between 1905 and 1919), Singleton lost his title which became vested in McMullan and Son. In 1919, McMullan and Son conveyed this land to Singleton's son, Bunyan Blalock (now deceased), who thereafter resided in Laurel, Mississippi, until he died intestate in 1960. His heirs are the individual appellants herein.
Another of Singleton's sons was Acquilla (Quilla), who just after World War I (about 1919 or 1920) moved upon the property where he continued to reside until his death in 1963. After Singleton lost his property and Bunyan acquired it, Quilla cared for his father there until Singleton died in 1922. Quilla's descendants assert, and the lower court found, that Quilla, by adverse possession against his brother Bunyan, gained title to which the appellees succeeded upon Quilla's death. Appellants take the position that when Quilla began occupying the property about 1920, his occupation was permissive pursuant to an understanding with Bunyan (record title holder) that Quilla might live there and have what he made provided he would take care of their parents, Singleton and Lucy Blalock, and an "afflicted" sister. Other facts and testimony will be stated where appropriate in this opinion.
The dispositive issue is: Did Quilla's occupation and acts with reference to the disputed lands ripen into title by adverse possession?
According to the record, Quilla continuously occupied the land after about 1920, farmed it until he died in 1963, and reared his family there. Most of the time, Quilla and his heirs (appellees) paid taxes on the *500 property. All the while, the tax assessment was in Bunyan's name until his death after which the land was assessed to his heirs (appellants). In 1933, Quilla acquired title to and claimed homestead exemption on a 160 acre tract adjacent to the subject land. After Quilla's death his survivors continued to claim homestead exemption on the tract purchased in 1933. In his lifetime Quilla performed the following significant acts consistent with a claim of ownership: put up fences; built and repaired the house there; pastured cows; raised row crops; cut trees for posts, firewood and cash; planted trees; built outbuildings and added a bathroom to the house; raised truck crops; dug a pond and stocked it with fish; made a well; and paid taxes. Quilla received all profits from the land.
Subsequent to Quilla's death, his heirs continued to perform similar acts regarding their use of the disputed land. According to the testimony of several elderly residents of the community, it was the general reputation there that the land in controversy was part of the "Quilla Blalock place." Based upon the evidence submitted on behalf of the appellees, the chancellor ruled that Quilla (though he had no color of title) gained title by adverse possession prior to his death and prior to the death of Bunyan Blalock.[1]
The appellants presented testimony indicating that Quilla's occupation and acts upon the land were permissive and in recognition of the fact that title belonged to his brother Bunyan. It is not contradicted that taxes on the disputed property were assessed in the name of Bunyan Blalock throughout all the years in question. Especially significant is the fact that when he paid the ad valorem taxes on the property in Bunyan's name, Quilla forwarded the tax receipts to Bunyan who then deducted the amount from his income tax returns. Homestead exemption on the subject property was never claimed by Quilla or appellees, but they claimed it on adjacent property. In 1971 the appellees executed an oil lease to Mr. George May on their 160 acre adjacent tract but did not lease the disputed property. They told Mr. May that Bunyan Blalock held record title to the land in controversy. A recital in the lease executed by the appellees on their adjacent land states:
This lease also covers and includes all land owned or claimed by Lessor adjacent or contiguous to the land particularly described above, whether the same be in said section or sections, grant or grants, or in adjacent sections or grants, although not included within the boundaries of the land particularly described above. For the purpose of calculating the rental payments hereinafter provided for, said land is estimated to comprise 160 acres, whether it actually comprises more or less.
According to Camellia Baskin, appellant daughter of Bunyan Blalock, a year or two after Quilla died, Quilla's son Billy (appellee) came to Laurel and sought out appellants in an attempt to buy one acre of land out of the controversial subject property for a homesite. Camellia stated that they refused to sell him any of their land but told him he could stay there and take care of the place. Billy recalled the incident and testified, "I wanted them to deed me the land so I could get a loan on it."
Appellants presented other testimony from people who live in the area to the effect that Quilla had told them in his lifetime that the land belonged to Bunyan who gave him permission to live on the land. Other testimony was to the effect that one Walter Williams had knowledge that Bunyan paid for the house constructed on the controversial property. Williams stated that he saw Bunyan deliver payment to the two builders who constructed the house. Arthur Blalock, another witness (nephew of Quilla and Bunyan), saw his Uncle Bunyan pay for a water well and pump which were installed on the place.
*501 Attorney Major Holifield of Laurel testified that in May 1978 he went to see appellee Billy Blalock who was living on the disputed property. Hollifield's purpose was to present a lease to Billy Blalock which provided that Billy would pay annual rentals of $100 if he desired to continue occupying the land. Hollifield stated that Billy considered the rent too high but would agree to pay taxes on the property. According to Hollifield, after a new lease was drawn Billy stated he would not sign it until he consulted his attorney.
Appellants offered to sell the timber on the property to Georgia Pacific in 1977. After having the timber cruised, Georgia Pacific offered appellants $96,006 for the timber, which they accepted. Appellee Billy Blalock stated to the court at the trial that when Georgia Pacific's engineers came out to stake the property, he understood what they were doing and imagined that Bunyan's heirs were selling the timber although he made no statement that day that the appellees owned the land. After Georgia Pacific paid the appellants for the timber in September 1978 and began to cut the timber, appellees objected, and this suit ensued with the appellees asserting title by adverse possession.
We think a significant and distinguishing feature of this case regards the payment of taxes on the subject land. Quilla and his successors (appellees), by paying the taxes in Bunyan's name and then mailing the tax receipts to him so that he and later his family could claim credit on their income tax returns, in effect, recognized title in Bunyan Blalock. In doing so, they negated any hostile aspect of their claim or any claim of a parol gift. It is inconsistent to say on the one hand that Quilla was openly and notoriously claiming title adverse to the record owner (his brother, Bunyan) and the whole world when at the same time he was sending tax receipts to Bunyan and allowing Bunyan to obtain income tax credits. Claiming title adversely while at the same time sending tax receipts to the record owner has aspects of secret or surreptitious possession and is contrary to our decisional law on adverse possession. Berry v. Houston, 195 So.2d 515 (Miss. 1967).
It is true that the appellees' occupation of the land, in a number of respects, was consistent with adverse possession. The lower court's opinion, however, correctly noted that certain testimony was
[T]o the effect that old Bunyan Blalock permitted his brother, Quilla, to reside thereon, on condition that Quilla would take care of their father, Singleton Blalock and their mother, Lucy, during their lifetimes, which was fully complied with.
Absent color of title, parol gift, or some special circumstances not here present, where the parties are closely related to each other, proof of adverse possession is not ordinarily as easily established as when the parties are strangers. Stronger evidence is desirable in such cases. 3 Am.Jur.2d 139 and 229, Adverse Possession, §§ 49 and 147 (1962). The appellees conceded at oral argument that when Quilla first began to occupy the land, his occupation was permissive rather than hostile. Presented here is a case significantly different from Thomas v. Collins, 253 So.2d 824 (Miss. 1971) where it was held that the litigant asserting adverse possession had color of title from the beginning by means of a parol gift. After Quilla's occupancy of the land immediately after World War I, taxes were always paid in Bunyan's name, and tax receipts were furnished to Bunyan for his benefit. During this time, Bunyan was the record owner, but Quilla paid taxes for most of the years. Neither Quilla nor his successors ever claimed homestead exemption on this disputed land but did claim homestead exemption on adjacent property which he purchased in 1933, some 13 years after his occupancy of the disputed land began. After Quilla's death in 1963, his successors' possession was no more adverse than was his possession in his lifetime. As was true in Geoghegan v. Krauss, 228 Miss. 231, 87 So.2d 461 (1956), taxes against the land were never assessed in the name of any adverse claimant. It is true that here Quilla and his successors (appellees) paid the taxes most of the time, but sending the *502 tax receipts to the record title holder Bunyan and his heirs was a recognition of their title.
The rule is that one asserting title by adverse possession has the burden of proof which the appellees failed to meet in this case. Their (and Quilla's) possession was permissive in the beginning, and the proof does not sufficiently establish subsequent adverse possession as to appellants and their predecessor, the record title holder, Bunyan. Upon this record, the lower court's decree that Quilla and his successors (appellees) gained title by adverse possession was contrary to the overwhelming weight of the evidence, manifestly wrong, and cannot be upheld.
REVERSED AND RENDERED.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BOWLING and COFER, JJ., concur.
PATTERSON, C.J., and LEE, J., take no part.
NOTES
[1] Appellees' bill in this cause avers "that there is a presumption of a lost grant" but does not aver to whom or by whom such a "lost grant" was executed. Their bill makes no mention whatever of any "parol gift" of the land, but both the lower court's opinion and final decree are without any finding of "lost grant" or "parol gift."